CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

September 30, 2024
LAURA A. AUSTIN, CLERK
BY:        /s/T. Taylor
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CHARLES KENZELL CARTER,          )
     Plaintiff,                 )        Civil Action No. 7:21-cv-00484
                               )
v.                               )
                               )        By: Elizabeth K. Dillon
SERGEANT A. BENTLEY,             )           Chief United States District Judge
     Defendant.                 )

**MEMORANDUM OPINION**

Plaintiff Charles Kenzell Carter, a state inmate proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983 in 2021.[1]  On September 8, 2022, Carter filed an amended complaint against 10 defendants, asserting violations of his rights under the Eighth and Fourteenth Amendments to the United States Constitution, as well as violations of state law.  (Dkt. No. 46.)  The defendants filed a partial motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  That motion was granted in part and denied in part on June 7, 2023, leaving only certain claims asserted against Sergeant A. Bentley.  (Dkt. No. 67.)

Pending before the court is Bentley's motion for summary judgment.  (Dkt. No. 88.)  The motion has been fully briefed and is ripe for resolution.  For the reasons set forth below, the motion for summary judgment will be denied.

I.  BACKGROUND

**A.  Summary of Allegations and Remaining Claims**

The remaining claims against Bentley stem from events that occurred at Red Onion State Prison (Red Onion) on June 3, 2021.  In his amended complaint, Carter alleges that Bentley

---

[1]  The case previously was assigned to two other district judges before being reassigned to a magistrate judge pursuant to 28 U.S.C. § 636(c).  The case was transferred to the undersigned on May 8, 2024.

intentionally placed him in ambulatory restraints that were so tight that he suffered "lasting pain and physical bruises" to his upper and lower extremities.  (Am. Compl. 4, Dkt. No. 46.)  Carter alleges that Bentley and other officers subsequently picked him up and threw him inside his cell as he complained of pain.  While in the cell, Carter "remained [lying] on the floor unable to move" and "was force[d] to release and urinate on the cell floor."  (*Id.* at 5.)  A few hours later, Lieutenant J. Hall instructed Bentley to reapply the restraints after Carter complained about them being too tight.  Carter alleges that Bentley claimed to not be able to get the key to work and ultimately "left the shackles tight, forcing [him] to remain and endure the physical pain and tightness of the restraints [as they] cut into [his] flesh."  (*Id.* at 6.)  Carter alleges that he "received no further relief from the restraints being tight" and that he "was forced to remain in one position" in the ambulatory restraints for a total of approximately 18 hours.  (*Id.* at 6–7.)  He further alleges that he "did not receive any due process notice hearing or approval by mental health for the use of such restraints."  (*Id.* at 7.)

Based on these allegations, Carter claims that Bentley used excessive force and acted with deliberate indifference to a substantial risk of serious harm, in violation of the Eighth Amendment.  (*Id.* at 12–13.)  Carter also claims that the ambulatory restraints were "applied without due process of law" in violation of the Fourteenth Amendment.  (*Id.* at 13.)  Additionally, Carter claims that Bentley's actions rose to the level of gross or willful and wanton negligence.  (*Id.* at 15; *see also* Mem. Op. 10, Dkt. No. 66 (construing the negligence claim in the amended complaint to allege more than ordinary or simple negligence).)

**B.  Bentley's Evidence**

According to the declarations submitted in support of Bentley's motion for summary judgment, Bentley and Hall were called to respond to the A-4 housing pod shortly after 11:00

a.m. on June 3, 2021, following an incident involving Carter and Officer N. Perrigan. (*See* Hall Decl. ¶ 6, Dkt. No. 89-1; Bentley Decl. ¶ 6, Dkt. No. 89-1.)  At the time of the incident, Carter was confined in cell 406 on the bottom tier of the pod, and Perrigan was delivering lunch trays to inmates through the tray slots in the cell doors.  Hall's declaration indicates that he was advised that Carter had thrown urine on Perrigan's face and chest when Perrigan attempted to deliver Carter's lunch tray.  (Hall Decl. ¶ 6.)  Hall shared that information with Bentley when he arrived on the scene, and according to Bentley, Carter admitted to having "thrown urine in a staff member's face." (Bentley Decl. ¶ 6.)

Hall asserts that he and other officers "tried to calm . . . Carter down, but he remained disruptive and threatening."  (Hall Decl. ¶ 7.)  Hall further asserts that he recommended that Carter be placed in ambulatory restraints "[b]ecause Carter continued to be disruptive and his behavior posed a physical threat."  (*Id.* ¶ 8.)  "Ambulatory restraints consist of handcuffs, leg irons, a black box, and a chain connecting the black box on the handcuffs to the leg irons."  (*Id.* ¶ 9.)  When applied properly, ambulatory restraints "allow the inmate the stand upright, walk around, use the toilet, wash himself, and feed himself."  (*Id.*)  The restraints are not attached to anything other than the inmate.  (*Id.*)

After Hall's recommendation was approved by M. Counts, the Administrative Duty Officer that day, Hall directed Bentley to place Carter in ambulatory restraints.  (*Id.* ¶ 11.)  Hall was present when the restraints were applied by Bentley, and he supervised the process.  (*Id.* ¶ 13.)  While Carter was still in his cell, Bentley first put handcuffs on Carter's wrists through the tray slot in the cell door.  (Bentley Decl. ¶ 9.)  He then instructed Carter to kneel on the floor. (*Id.* ¶ 10.)  After Carter complied, the cell door was opened, and Bentley placed leg irons on Carter's ankles while two other officers secured Carter.  (*Id.* ¶ 11.)  Hall and another officer

3

walked Carter out of his cell and placed him in a kneeling position against the wall of the pod, and Bentley attached one end of the chain to Carter's leg irons.  (*Id.* ¶¶ 12–13.)  With the assistance of two officers, Bentley removed Carter's handcuffs and reapplied them to the front of Carter's body.  (*Id.* ¶ 14.)  Bentley then attached the black box to the handcuffs and the chain to the black box.  (*Id.*)  Once Bentley finished applying the ambulatory restraints, Hall had a nurse check them.  (Hall Decl. ¶ 18.)

After the restraints had been applied, Hall "directed Carter to stand up to go to his cell, and another officer ordered him to stand up."  (Hall Decl. ¶ 19.)  Hall asserts that, despite their orders, "Carter refused to stand up."  (*Id.*)  Consequently, Hall "ordered the officers to pick him up and take him to his cell."  (*Id.*)

The officers placed Carter in the cell doorway, and Hall ordered Carter to slide on his knees into the cell.  (*Id.* ¶ 20.)  Carter fell forward when two officers attempted to help him move.  Hall asserts that Carter failed to comply with another order to slide into the cell and that Hall then instructed Bentley and another officer to lift and carry Carter into the cell.  (*Id.* ¶ 20.)

After Carter was locked in his cell, Hall, Bentley, and the other officers left the pod. While in the vestibule outside the pod, "the nurse recommended to [Hall] that one of the leg irons be loosened."  (*Id.* ¶ 21.)  The officers returned to the cell, and Bentley adjusted the leg irons.  The nurse then "checked the ankle cuffs and gave a two-thumbs-up signal."  (*Id.* ¶ 22.) Hall and Bentley maintain that "[t]he restraints were not too tight on Carter" and that Bentley had "properly applied them."  (*Id.*; *see also* Bentley Decl. ¶ 21.)

Later that day, according to Hall's declaration, Hall "saw [Carter] manipulating his leg irons."  (Hall Decl. ¶ 24.)  Hall maintains that Carter "continued to threaten staff" when Hall spoke to him and "stated that he was 'not finished' and he was going to hurt an officer."  (*Id.* at

¶ 25.)  Hall directed Bentley to readjust the leg irons.  (Bentley Decl. ¶ 23.)  During the

adjustment, which occurred at approximately 3:45 p.m., Hall noticed a string that he believed

that Carter had used to attempt to manipulate the leg restraints.  (Hall Decl. ¶ 27.)  Hall and

Bentley also maintain that "Carter had placed an item in the keyhole of the leg irons in an

attempt to manipulate them."  (*Id.*; *see also* Bentley Aff. ¶ 24.)  Bentley asserts that he eventually

"was able to loosen the left ankle restraint so that two fingers could be placed under it."  (Bentley

Aff. ¶ 24.)  Hall "tested the right ankle restraint and ordered [Bentley] to tighten it by one more

notch," and Bentley complied with that order.  (*Id.* ¶ 25.)  According to Bentley, Carter admitted

"that he had put something in [it] to loosen it up."  (*Id.* ¶ 26.)  Bentley and Hall both maintain

that the restraints were not too tight at that time and that Carter did not appear to have any

bruising, abrasions, or swelling.  (*Id.* ¶¶ 27–28; *see also* Hall Decl. ¶¶ 30–31.)

   Bentley left Red Onion at approximately 6:15 p.m. on June 3, 2021, after his shift ended.

(Bentley Decl. ¶ 29.)  At approximately 3:45 a.m. on June 4, 2021, Lieutenant J. Fleming

recommended that Carter be released from ambulatory restraints "due to his behavior subsiding."

(Fleming Decl. ¶ 5, Dkt. No. 89-3.)  Fleming denies seeing any bruises, scrapes, or swelling on

Carter's ankles or wrists during the process of removing the restraints.  (*Id.* ¶ 7.)  Medical

records submitted by Bentley include no mention of Carter being treated for cuts, scrapes, or

bruises following his release from ambulatory restraints.  (*See* Trent Decl. Encl. A, Dkt. No. 89-

4.)

   Bentley submitted four video files in support of his motion for summary judgment.  The

first file, labeled Hall Encl. A_Pod Video Footage 6-3-21, contains footage from a surveillance

camera located on the wall across from cell 406, which has no sound and provides a bird's eye

view of the pod.  The footage from that camera begins with a recording time of 10:57:39 on June

3, 2021, and shows Perrigan delivering meal trays to the inmates on the bottom tier of the A-4 pod.  (*See* Hall Decl. ¶ 6 (identifying Perrigan in the video).)  At the 0:26 mark,[2] Perrigan approaches Carter's cell (cell 406).  Carter can be seen reaching through the tray slot as Perrigan appears to be holding a red or orange tray.  At the 0:43 mark, Perrigan backs away from the cell door while still holding the tray, and Carter can be seen tossing an item through the tray slot. Perrigan then drops the tray on the pod floor, closes the tray slot, and exits the pod.  At the 1:49 mark, three officers enter the housing unit and approach Carter's cell.  They are then joined by two additional officers, followed by another officer.  Some of the officers remain outside Carter's cell until the 7:29 mark, when one of them opens Carter's cell door.  At the 7:50 mark, Carter is brought outside the cell with his hands restrained behind his back, and officers place him against the wall on his knees.  At the 11:53 mark, the officers on each side of Carter stand him up, and he falls back to his knees a few seconds later.  At the 17:53 mark, the officers appear to drag Carter to his cell on his knees.  At the 18:45 mark, the officers move Carter into the cell. The cell door closes at the 19:00 mark, and the officers exit the pod.  At the 20:19 mark, several officers return to the pod and approach Carter's door.  The door opens at the 21:00 mark, and four officers enter the cell while another officer stands at the cell door.  A nurse enters the cell at the 22:40 mark.  The officers and the nurse exit the cell shortly thereafter, and the cell door closes again at the 23:04 mark.  The officers and the nurse then exit the housing unit.  Given the distance between the camera and the cell, the surveillance footage does not provide a clear view of Carter being placed in ambulatory restraints or any other actions that occurred while the officers were inside Carter's cell.

---

[2] The court will refer to the elapsed time at the bottom of the videos when describing specific portions of the video footage.

The second file, labeled Hall Encl. B_Handheld Video 6-3-21, contains video and audio footage from a handheld camera. The video is approximately 19 minutes long, and at the beginning of the video, Hall announces the date and time as June 3, 2021, at approximately 11:00 a.m. (*See* Hall Decl. ¶ 12 ("I was the officer who spoke at the beginning of the recording."). Hall then reports that Carter had just "assaulted" Officer Perrigan "with urine" and that Carter was going to be placed in ambulatory restraints. At the 1:36 mark, Bentley can be seen placing handcuffs on Carter's wrists as Carter stands with his back to the open tray slot. (*See* Bentley Decl. ¶ 9 (identifying himself as the officer responsible for handcuffing Carter's wrists).) Carter subsequently complies with an order to kneel on the floor, and his cell door is opened. At the 2:33 mark, two other officers lift Carter to his feet, walk him to the wall beside a neighboring cell, and place him on his knees. At that time, Carter's ankles are cuffed and his arms are cuffed behind his back. At the 3:07 mark, Bentley begins placing the leg irons on Carter while two other officers maintain control of Carter. Carter asserts that he is being unlawfully placed in ambulatory restraints. Additionally, at the 3:30 mark, Carter can be heard telling the officers that they are violating his due process rights by placing him in ambulatory restraints without a hearing. He remains physically compliant during the application of the leg irons. While three officers are surrounding Carter, Bentley reapplies Carter's handcuffs in front of his body. At the 5:19 mark, Carter asserts that his right thumb is broken. Approximately 30 second later, Carter reports that he does not need a nurse. At the 6:35 mark, the officers on each side of Carter lift him to a standing position. Carter reports that the leg irons are too tight and that he cannot stand up, and he kneels back down on the floor. At the 7:45 mark, while still kneeling on the floor, Carter says that he is "hurt." He asks to speak to a supervisor, and when Hall approaches, Carter reports that the officers are violating prison policy and that he has

already filed a lawsuit.  At the 9:45 mark, while Carter is still kneeling on the floor, he reports

having knee problems and arthritis.  He continues to be held in a kneeling position until the

11:40 mark, when a male nurse arrives to check his leg restraints.  While the nurse is there,

Carter again complains of the restraints being too tight and mentions having a broken finger.  At

the 12:32 mark, officers drag Carter back to his cell while he is still on his knees.  The officers

then turn Carter onto his left side and push him onto the floor inside his cell.  Carter immediately

screams, and Bentley and another officer lift Carter back onto his knees.  At the 13:26 mark,

Bentley and two other officers lift Carter off the floor and place him in the cell.  Carter can be

seen lying on the floor as the door closes at the 13:43 mark, and the officers leave the pod.

Less than two minutes later, the officers return to Carter's cell, and Bentley informs

Carter that they are going to loosen the leg irons.  At the 15:44 mark, Carter's cell door opens,

and Bentley, Hall, and two other officers enter the cell.  Bentley appears to adjust the leg irons as

Carter is lying facedown on the floor.  At the 16:41 mark, a clicking sound can be heard, and

Carter begins shouting and crying for help.  At the 17:24 mark, the nurse returns to the cell and

kneels near Carter's feet, blocking the view of the camera.  Hall asks if the restraints are "good,"

and the nurse responds by holding up his two thumbs.  Carter continues lying face down as the

officers leave the cell, and the cell door closes at the 17:49 mark.  Although the leg restraints can

be seen in the video before the door closes, it does not clearly show how tight the restraints are

on each ankle.

After the officers and the nurse leave the housing unit but before the recording ends, an

officer announces at the 18:32 mark that Carter's actions "were very disruptive," that he had

"assaulted staff," and that "ambulatory restraints were utilized to control [Carter's] behavior."

The officer then reports that the restraints had been readjusted at the recommendation of medical

and that the nurse had checked them.  The camera then points in the nurse's direction, and the nurse reports that he was able to get two fingers under each restraint, that Carter's skin was intact with no discoloration, and that Carter "voiced no other complaints."

The third video file, labeled Hall Encl. C_Cell #406 Video Footage 6-3-21, is approximately five and a half minutes long.  At the beginning of the video, Bentley announces the date and time as June 3, 2021, at approximately 3:45 p.m.  He then reports that Carter has manipulated the restraints and made them too tight, and that Bentley, Hall, and another officer are going to readjust the leg restraints and have Carter reassessed by medical.  As the door opens at the 0:36 mark, Carter is kneeling in the cell.  The camera zooms in on the leg restraints, and a piece of string appears to be wrapped around the right leg restraint.  Bentley then kneels behind Carter, blocking the view of the leg restraints.  At the 1:12 mark, a clicking sound can be heard, and Carter mentions "pressure." Hall subsequently informs Carter that the policy requires there to be space for two fingers to fit between the restraints and Carter's ankles, and that he can see two fingers.  At that point, Bentley's body continues to block the view of the leg restraints.  At the 3:07 mark, Hall asks Carter what he "put in that restraint."  Carter responds that he "tried to loosen it up."  At the 3:29 mark, Bentley kneels behind Carter and maneuvers the leg restraints.  At the 4:19 mark, the nurse returns to the cell and kneels behind Carter.  Another officer on the scene then moves in front of the camera, blocking the view of the cell.  After the nurse exits the cell, Hall leans down and moves the restraint around Carter's right ankle.  Immediate after that, at the 4:38 mark, Carter can be heard saying "ow."  Bentley then kneels behind Carter and maneuvers the leg restraints.  The nurse enters the cell again at the 5:07 mark and kneels behind Carter.  Once again, the nurse's position blocks the camera's view of the leg restraints.  After exiting the cell, the nurse reports being able to "put two fingers under each extremity."  The

nurse also indicates that Carter's skin is intact with no discoloration.  The video ends as the cell door is being closed.

The fourth video file, identified as Fleming Encl. A_Handheld Video 6-4-21, is nearly 10 minutes long.  At the beginning of the video, Fleming announces the date and time as June 4, 2021, at 3:37 a.m.  *See* Fleming Aff. ¶ 6 (identifying himself as the officer speaking at the beginning of the video).  Fleming then reports that Carter is going to be removed from ambulatory restraints "due to his behavior subsiding."  The door opens at the 0:43 mark, and Carter is kneeling on the floor inside the entryway.  At the 1:50 mark, Fleming inquires as to whether Carter has any complaints and Carter responds in the affirmative.  Fleming calls for a nurse to come to the housing unit.  At the 4:11 mark, Carter complains about his right thumb being broken.  Less than a minute later, Carter is asked to identify his medical complaints.  In response, Carter mentions his left leg and asserts that the restraints are excessively tight.  He also mentions his right thumb again.  A female nurse can be heard advising Carter that he will need to write to medical regarding his complaints.  The officers then proceed to remove the ambulatory restraints.  The female nurse is not seen in the video footage until after the cell door closes and Carter is left alone in the cell.  At the 9:20 mark, the nurse reports that Carter voiced "no medical complaints" and that his skin is "intact and free of abrasions."  It does not appear from the video that the nurse entered the cell to examine Carter's wrists or ankles.

Bentley also submitted a Special Watch Log dated June 3, 2021, along with a supplemental declaration from Hall.  (*See* Hall Supp'l Decl. & Encl. A, Dkt. No. 113-1.)  According to the declaration, Hall noted at 3:40 p.m. on June 3, 2021, "that Carter was 'threatening staff' and that he 'stated he wasn't finished' and 'was go[ing] to harm staff.'"  Hall Supp'l Decl. ¶ 5 (quoting Hall Supp'l Decl. Encl. A).)

### C. Carter's Evidence

In response to Bentley's motion for summary judgment, Carter submitted his own declarations signed under penalty of perjury, along with multiple exhibits.  In his initial declaration, Carter affirmatively denies throwing urine in Perrigan's face on June 3, 2021. (Carter Decl. ¶ 7, Dkt. No. 110-2.)  Carter asserts, in any event, that the tray slot was immediately closed "after the alleged[d] urine was throw[n]" and that he was "voluntar[ily] cooperative" from that point forward.  (*Id.* ¶ 8.)  Carter further asserts that neither Hall nor any other officer tried to calm him down or deescalate the situation before he was placed in ambulatory restraints.  (*Id.* ¶ 9.)  He contends that he nonetheless complied with the orders given to him by Hall and Bentley and that an incident report attached to his declaration supports this assertion.  (*Id.* ¶ 10 (citing Carter Decl. Ex. B-2, Dkt. No. 110-3 ("Sergeant Bentley gave inmate Carter orders to be restrained by staff and exit his assigned cell.  Inmate Carter complied with orders, and was removed from his assigned cell.")).)

Carter also submitted a redacted copy of the Virginia Department of Corrections (VDOC) Operating Procedure (OP) governing the use of restraints, which was produced during discovery. The policy indicates that "[i]nstruments of restraint may never be applied as punishment and are applied only with the approval of the Facility Unit Head or designee."  (OP 420.2 (eff. May 1, 2018) § IV(B)(5), Carter Decl. Ex. D, Dkt. No. 110-3.)  The policy also states that "[r]estraints will only be applied within a cell when the Facility Unit Head or designee determines that other less restrictive alternatives have not been effective or would not be effective" and that the restraints "will be removed as soon as it is safe to do so, the offender's dangerous or disruptive behavior has subsided, and it is determined the offender no longer poses a threat to himself or others."  (OP 420.2 § VI(D)(2)(a)&(f), Dkt. No. 85-1.)  Carter asserts that neither Bentley nor

Hall "took any less restrictive measures . . . before directly applying ambulatory restraints." (Carter Decl. ¶ 20.)

Carter alleges that Bentley applied the ambulatory restraints "excessively tight causing lasting pain and injur[ies]." (*Id.* ¶ 31; *see also id.* ¶¶ 12, 22.) Carter denies threatening anyone before or after being placed in ambulatory restraints and alleges that "the only threats made [were] to file a lawsuit," which he has a "protected right" to do. (*Id.* ¶ 27.) He maintains that the video footage of the restraints being applied confirms that he was not physically disruptive or combative during the application process and that he complained about the restraints being too tight. (*Id.* ¶ 32.) Carter further asserts that Bentley failed to loosen the leg restraints despite being instructed to do so. (*Id.* ¶ 44; *see also id.* ¶ 45 ("Defendant Bentley never did loosen the left restraints after being told to by Hall . . . .") To the extent that Bentley claims to have adjusted the restraints again around 3:45 p.m. on June 3, 2021, Carter asserts that he "had already been in the tight restraints since 11:05 AM . . . suffering from an already injured right thumb,[3] and the lasting pain." (*Id.* ¶ 51.) Although Carter acknowledges placing a piece of white string "between [his] flesh and the right [ankle] shackle," he asserts that he did so only to try to "cure the discomfort." (*Id.* ¶ 52.) Carter denies placing any other object in the leg shackles to try to manipulate them. (*Id.* ¶¶ 57–58.) He maintains that the leg shackles were already "broken" when Bentley applied them "excessively tight" and that the left shackle "cut[] into [his] left leg." (*Id.* ¶¶ 78, 85; *see also id.* ¶ 79 (alleging that Carter suffered significant pain "while left in tight broken shackles").)

---

[3] Carter alleges that he broke his thumb before being transferred to Red Onion. (Carter Decl. ¶ 62.) He has submitted medical records documenting his prior complaints of right hand and thumb pain. (*See, e.g.*, Carter Decl. Ex. J, Dkt. No. 110-3.)

In addition to his initial declaration, Carter filed a supplemental declaration accompanied by various exhibits.  The exhibits include Bentley's objections and responses to requests for admission in which he admitted that the "the tray slot was immediately closed" after Carter allegedly threw urine on Perrigan.  (Carter Supp'l Decl. Ex. B at 3–4, Dkt. No. 115-2 .)

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Chapman v. Oakland Living Ctr., Inc.*, 48 F.4th 222, 228 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)).  When ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party."  *Id.*; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (emphasizing that "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor").  The court "may not weigh the evidence or make credibility determinations, and is not in a position to disregard stories that seem hard to believe."  *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (internal quotation marks and citations omitted).  Instead, the court is tasked with determining "whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

In this case, the summary judgment record includes declarations and video evidence.  The United States Court of Appeals for the Fourth Circuit "has made clear that—so long as they are 'based on personal knowledge or firsthand experience'—'self-serving affidavits offered by the non-movant can be used as evidence to defeat summary judgment.'"  *Alexander v. Connor*, 105 F.4th 174, 178 (4th Cir. 2024) (quoting *Jones v. Solomon*, 90 F.4th 198, 206–07 (4th Cir. 2024)).  Although a "narrow exception" exists when a non-movant's version of the facts is "blatantly contradicted" by video evidence, that standard "is a very difficult one to satisfy."  *Lewis v.*

*Caraballo*, 98 F.4th 521, 529 (4th Cir. 2024) (internal quotation marks omitted) (discussing the exception recognized in *Scott v. Harris*, 550 U.S. 372 (2007)).  "A court may not disregard contrary evidence just because there is a video that lines up with 'a governmental officer's version of events' or 'even makes it unlikely that the plaintiff's account is true.'" *Alexander*, 105 F.4th at 179 (quoting *Witt v. West Va. State Police*, 633 F.3d 272, 276 (4th Cir. 2011) (first quote); *Harris*, 927 F.3d at 276 (second quote)).  Instead, a court considering a motion for summary judgment may discount a plaintiff's account "only when the plaintiff's version of events is so utterly discredited by the record that it constitutes visible fiction, such that no reasonable jury could believe it."  *Lewis*, 98 F.4th at 529 (internal quotation marks and alterations omitted).

## III.  DISCUSSION

### A.  Eighth Amendment Claims

"The Eighth Amendment, which is applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'"  *Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017) (quoting U.S. Const. Amend. VIII).  Carter asserts two Eighth Amendment claims against Bentley.  He claims that Bentley used excessive force in placing him in ambulatory restraints.  He also claims that Bentley acted with deliberate indifference to a substantial risk of serious harm.  The court will address each claim in turn.

#### 1.  Excessive Force

A claim of excessive force in violation of the Eighth Amendment involves both an objective and a subjective component.  *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021).  "The objective component asks whether the force applied was sufficiently serious to establish a cause of action."  *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019).  "This is not a high bar; de

minimis or trivial force is not enough, but anything more will suffice." *Dean*, 984 F.3d at 302. Although the Fourth Circuit "once considered the severity of an inmate's *injuries* under the objective component, the Supreme Court has clarified that what matters is the severity of the *force* employed." *Id.* at 303 (citing *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010)). "So long as the force used is more than de minimis, the objective component is satisfied, regardless of the extent of the injury." *Id.*

The subjective component asks whether the defendant "acted with a sufficiently culpable state of mind." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). "In contrast to the objective component, this is a demanding standard; the state of mind required is wantonness in the infliction of pain." *Brooks*, 924 F.3d at 112 (internal quotation marks, citations, and alterations omitted). "Whether an inmate can establish that impermissible motive turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Dean*, 984 F.3d at 302 (quoting *Whitley v. Albers*, 475 U.S 312, 320–21 (1986)).

The Fourth Circuit has explained that "officers employ force in 'good faith'—and thus permissibly—when they are motivated by an 'immediate risk[] to physical safety' or threat to prison order." *Id.* (quoting *Brooks*, 924 F.3d at 113.) Conversely, officers "cross the line into an impermissible motive when they inflict pain not to protect safety or prison discipline but to punish or retaliate against an inmate for his prior conduct." *Id.* "And the use of force on an inmate who is 'restrained and compliant and posing no physical threat' raises the specter of . . . an impermissible motive." *Id.* (quoting *Thompson v. Virginia*, 878 F.3d 89, 102 (4th Cir. 2017)).

The subjective component may be proven through direct or circumstantial evidence. *Id.* at 309. In *Whitley*, the Supreme Court identified "four non-exclusive factors" to assist in

15

assessing whether an officer acted with a sufficiently culpable state of mind.  *Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008).  Those factors are: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) 'any efforts made to temper the severity of a forceful response.'"  *Id.* (quoting *Whitley*, 475 U.S. at 321).  "If a reasonable jury could find, based on inferences drawn under the *Whitley* factors or other evidence, that [a correctional officer] used force maliciously to punish or retaliate against an inmate, then summary judgment is not appropriate."  *Dean*, 984 F.3d at 302.

Viewing the record in the light most favorable to Carter, the court concludes that genuine issues of material fact exist as to both components of the excessive force claim.  With respect to the objective component, a reasonable jury could find that Bentley used more than trivial or de minimis force.  Although the use of "[p]roperly applied" ambulatory restraints may not satisfy the objective component, *Blount v. Miller*, No. 7:14-cv-00007, 2015 WL 1505772, at *3 (W.D. Va. Mar. 31, 2025), Carter's sworn statements indicate that Bentley improperly applied the restraints excessively tight, causing significant pain.  Having carefully reviewed the available video footage, the court cannot find that it so blatantly contradicts Carter's account that the court is entitled to reject it at this stage of the proceedings.  In the handheld camera footage, Carter complains multiple times about the restraints being too tight, and he cries out in pain as Bentley maneuvers the leg restraints after being instructed to loosen them the first time.  Additionally, it is undisputed that the leg restraints had to be loosened again several hours later.  Although Bentley maintains that Carter caused the restraints to become too tight, Carter denies doing anything other than attempting to relieve the discomfort resulting from their initial application.

A jury could credit Carter's account of the restraints being applied excessively tight and, in doing so, find that Bentley used more than trivial or de minimis force.

The record also contains evidence from which a reasonable jury could find that Bentley used force "maliciously and sadistically" to punish Carter rather than in a "good faith effort to maintain or restore discipline." *Whitley*, 475 U.S. at 320–21.  With respect to the first and third *Whitley* factors—the need for the application of force and the perceived threat that the application of force was intended to quell—Bentley contends that "Carter had assaulted an officer, refused to calm down, and continued to be aggressive and disruptive" even "while he was placed in ambulatory restraints" Def.'s Mem. Supp. Mot. Summ. J. 17, Dkt. No. 89.  As Carter points out, however, the alleged assault occurred when he threw an item through the open tray slot on the door of his locked cell, and it is undisputed that the tray slot was immediately closed following the incident.  Moreover, consistent with Carter's sworn statements, an incident report prepared immediately following the incident indicates that Carter "complied with orders" while being removed from his cell, and the available video footage does not clearly depict any threat or display of physical force or aggression toward the officers immediately after the initial incident or during the restraint process.  Additionally, Carter denies making any threats other than those related to filing a lawsuit.  As noted above, "officers employ force in good faith—and thus permissibly—when they are motivated by an immediate risk[] to physical safety or threat to prison order." *Dean*, 984 F.3d at 303 (internal quotation marks omitted).  And the applicable VDOC policy appears to provide for the use of restraints within a cell only when an inmate's actions pose a physical threat to themselves or others and less restrictive alternatives would not be effective.  *See* OP 420.2 § (VI)(D)(2).  Viewing the evidence in the light most favorable to Carter, a reasonable jury could question whether Carter posed a physical threat or immediate risk

17

warranting the use of ambulatory restraints in his locked cell and whether the application of ambulatory restraints under the circumstances comported with the restraint policy.  *See Brooks*, 924 F.3d at 122 (noting that "whether an officer has complied with or, alternatively, violated a relevant use-of-force policy, while not dispositive, is highly relevant to [the subjective] inquiry").

Based on Carter's sworn statements, a reasonable jury could also find that the second *Whitley* factor—the relationship between the need for the use of force and the amount of force used—favors Carter, as does the fourth factor—whether actions were taken to temper the severity of the forceful response.  According to Carter, Bentley applied the ambulatory restraints excessively tight, he failed to loosen them even after being instructed to do so, and Carter remained in overly tight restraints for several hours while Bentley was on duty.  Although Bentley denies Carter's allegations and argues that the videos show that he calmly and carefully applied and adjusted the restraints, the video footage does not so clearly contradict the version of events provided by Carter that no jury could believe it.  Consequently, the court is required to credit Carter's version even if portions of the video footage "line[] up" with Bentley's version. *Alexander*, 105 F.4th at 179; *see also Witt*, 633 F.3d at 276 (emphasizing that courts may not "reject a plaintiff's account on summary judgment whenever documentary evidence, such as a video, offers *some* support for a governmental officer's version of events").

For these reasons, the court concludes that genuine issues of material fact exist as to whether Bentley "used more than de minimis force" in placing Carter in ambulatory restraints, and as to whether the restraints were "applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  *Dean*, 984 F.3d at 302–03 (internal quotation marks omitted).  These factual disputes and the related credibility

18

determinations must be resolved by a jury; they cannot be resolved by the court on summary judgment.  *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ."); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016) ("[W]here affidavits present conflicting versions of the facts which require credibility determinations, summary judgment cannot lie.") (internal quotation marks omitted).

### 2.  **Deliberate Indifference**

Carter also claims that Bentley acted with deliberate indifference to a substantial risk of serious harm.  In addition to limiting the conduct of prison officials, the Eighth Amendment "imposes duties on these officials, who must provide humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  "Like any other Eighth Amendment claim, an Eighth Amendment conditions of confinement claim has (1) objective and (2) subjective components." *Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019) (internal quotation marks omitted).  "To satisfy the objective component, a plaintiff must establish that the deprivation alleged was, objectively, sufficiently serious." *Id.* (internal quotation marks and alterations omitted).  "To be sufficiently serious, the deprivation must be extreme—meaning that it poses a serious or significant physical injury resulting from the challenged conditions, or a substantial risk of serious harm resulting from exposure to the challenged conditions." *Id.* (internal quotation marks and alterations omitted).

To satisfy the subjective component, a plaintiff must show that a prison official "acted with deliberate indifference"— specifically, "that the official knew of and disregarded an excessive risk to inmate health or safety." *Id.* at 361 (internal quotation marks and alterations omitted).  "Deliberate indifference is more than mere negligence, but less than acts or omissions

done for the very purpose of causing harm or with knowledge that harm will result." *Id.* (internal

quotation marks and alterations omitted).  "Whether a prison official had the requisite knowledge

of a substantial risk is a question of fact subject to demonstration in the usual ways, including

inference from circumstantial evidence, and a factfinder may conclude that a prison official knew

of a substantial risk from the very fact that a risk was obvious." *Makdessi v. Fields*, 789 F.3d

126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842).

Viewing the record in the light most favorable to Carter, the court concludes that genuine

issues of material fact exist that preclude entry of summary judgment on the deliberate

indifference claim.  Although no restraint-related physical injuries are documented in Carter's

medical records or readily apparent in the video footage,[4] Carter has sworn under penalty of

perjury that he experienced extreme pain from being confined in excessively tight restraints for

multiple hours under Bentley's watch, and he can be heard complaining of pain and crying out in

pain in the handheld video footage.  While "routine discomfort is part of the penalty that criminal

offenders pay for their offenses against society," *Hudson v. McMillian*, 503 U.S. 1, 8 (1992), a

reasonable jury could find that Carter experienced pain sufficiently serious to surpass that

threshold and satisfy the objective component.  *See, e.g.*, *Mason v. Conn. Dep't of Corr.*, No.

3:21-cv-1088, 2022 WL 19341, at *6 (D. Conn. Jan. 3, 2022) (concluding that an inmate

"sufficiently established the objective component for purposes of initial review by alleging that

the tight cuffs and short-chained in-cell restraints caused him extreme pain over an extended

period of time and sleep deprivation"); *Blount*, 2015 WL 1505772, at *5 (denying summary

judgment on a restraint-related claim of deliberate indifference where the plaintiff alleged that he

---

[4] While Carter complains of having a broken thumb in the video footage, he does not connect the thumb injury to the application of ambulatory restraints.  He indicates in response to the motion for summary judgment that the thumb injury occurred before he arrived at Red Onion.

suffered "significant and prolonged pain" as a result of being held in improperly-applied ambulatory restraints).  A reasonable jury could also credit Carter's testimony that Bentley failed to loosen the restraints despite being told that they were too tight and, in doing so, acted with deliberate indifference to a substantial risk of serious harm.

Once again, at this stage of the proceedings, "[it] is not [the court's] job to weigh the evidence, to count how many affidavits favor the plaintiff and how many oppose him, or to disregard stories that seem hard to believe." *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991). "Those tasks are for the jury." *Id.*  Thus, even if the court were to believe that Bentley would prevail if the claim of deliberate indifference is tried on the merits, the court "cannot base a grant of summary judgment merely on [such] belief." *Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, 342 (4th Cir. 2023).  "Rather, the standard requires the court to conclude that the evidence could not permit a reasonable jury to return a favorable verdict to the nonmovant." *Id.* (internal quotation marks omitted).  Because Carter has presented evidence from which a reasonable jury could find that Bentley acted with deliberate indifference to a substantial risk of serious harm, Bentley is not entitled to summary judgment.

**B.  Due Process Claim**

Carter also claims that Bentley violated the Fourteenth Amendment by placing him in ambulatory restraints without providing due process.  (*See* Am. Compl. 7, 13.)  "Due process contains both substantive and procedural components." *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 145 (4th Cir. 2014).  "Procedural due process prevents mistaken or unjust deprivation, while substantive due process prohibits certain actions regardless of procedural fairness." *Id.*  Carter claims that he was denied procedural due process.

Bentley declined to respond to the merits of the procedural due process claim on the basis that the court "need not analyze [it]" since "Carter's failure to protect and excessive force claims are based on the Eighth Amendment."  (Def.'s Mem. Supp. Mot. Summ. J. 18; *see also* Def.'s Reply Mem. Supp. Mot. Summ. J. 8, Dkt. No. 8 ("Carter has not presented a due process claim against Bentley other than his claims based on the Eighth Amendment. His due process claim[] should be dismissed.").)  In making this argument, Bentley relies on the more-specific-provision rule established in *Graham v. Connor*, 490 U.S. 386, 395 (1989).  That rule, however, does not require "that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth amendment; rather [it] simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of *substantive due process*."  *United States v. Lanier*, 520 U.S. 259, 272 (1997).  Because Carter asserts a procedural, rather than substantive, due process challenge, his claim is not barred by the more-specific-provision rule.  *See Cyr v. Addison Rutland Supervisory Union*, 955 F. Supp. 2d 290, 292–93 (D. Vt. 2013) ("The Supreme Court has not extended the *Graham* rule to procedural due process claims.  Nor would it be appropriate to do so.  Procedural due process guarantees a fair procedure.  A procedural due process claim seeks to redress the process by which a liberty or property interest is denied, not the actual denial of that right.").  Thus, Bentley's motion for summary judgment as to the due process claim based on the *Graham* rule must be denied.

## C.  Negligence Claims

In addition to his federal constitutional claims, Carter asserts that Bentley's conduct was grossly and/or willfully and wantonly negligent.  "Under Virginia law, the standard for willful

and wanton negligence closely mirrors the subjective prong of the deliberate indifference test,"
*Boley v. Armor Corr. Health Servs.*, No. 2:21-cv-00197, 2022 WL 16950920, at *10 (E.D. Va.
Nov. 15, 2022) (citing *Hixson v. Hutcheson*, No. 5:17-cv-00032, 2018 WL 814059, at *9 (W.D.
Va. Feb. 9, 2018)), and "a claim of gross negligence under Virginia law requires a lesser
showing . . . than a claim for deliberate indifference under the Eighth and Fourteenth
Amendments," *Hixson*, 2018 WL 814059, at *9.  Having concluded that summary judgment is
inappropriate on the deliberate indifference claim under the Eighth Amendment, the court will
also deny summary judgment on the negligence claims.  *See Boley*, 2022 WL 16950920, at *10;
*see also Smith v. Wellpath, LLC*, No. 2:20-cv-00077, 2023 WL 9317261, at *13  (E.D. Va. Mar.
30, 2023) (allowing claims of gross negligence and willful and wanton negligence to proceed
based on the court's decision to deny summary judgment on the plaintiff's claim of deliberate
indifference).

## IV.  CONCLUSION

For the foregoing reasons, Bentley's motion for summary judgment is denied.[5]  An
appropriate order will be entered.

Entered: September 30, 2024.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
Chief United States District Judge

---

[5]  In light of the court's decision, Carter's motion to compel Bentley to produce additional evidence (Dkt.
No. 99), some of which has already been provided to Carter, and his motion to strike all evidence submitted from
Hall (Dkt. No. 117) will be denied as moot.  If Carter believes that he needs additional evidence to prepare for trial,
he may file an appropriate motion.